**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ ) | | |
| JOHN GOODYKOONTZ ) | | |
| 1314 5th St., N.W., Unit B ) | | |
| Washington, D.C. 20001 ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | Case No.: | |
| ) | | |
| DISTRICT OF COLUMBIA ) | | |
| Office of the Attorney General ) | | |
| 441 4th St., N.W. ) | | |
| 6th Floor South ) | **COMPLAINT** | |
| Washington, D.C. 20001 ) | | |
| ) | JURY TRIAL DEMANDED | |
| Executive Office of the Mayor ) | | |
| John A. Wilson Building ) | | |
| 1350 Pennsylvania Ave., N.W. ) | | |
| Washington, D.C. 20004 ) | | |
| ) | | |
| Defendant. ) | | |
| _____) | | |

## INTRODUCTION

1.     In April 2014, John Goodykoontz, who has Type 1 diabetes (also known as insulin-dependent diabetes), was trapped in the District of Columbia detention system for several days because Defendant, the District of Columbia ("the District" or "Defendant"), lacks the most basic safeguards to ensure that detainees with disabilities have access to medical care required by federal and District of Columbia law.  As a consequence of Defendant's actions, Mr. Goodykoontz—who at that time was a graduate student in interior design and architecture—unnecessarily suffered, and continues to suffer, significant physical and emotional harm.

2.      As may happen to any of the thousands of District of Columbia residents with diabetes or other disabilities requiring regular administration of medication, Mr. Goodykoontz was arrested in connection with minor traffic violations.  Although he had no previous criminal record, he was detained and denied a timely arraignment due to medical complications caused by Defendant's refusal to allow him access to his insulin.

3.      The District, as a matter of policy, refuses to permit the administration of insulin other than by medical personnel, and then does not provide timely access to medical personnel. The result is that those who, like Mr. Goodykoontz, require regular insulin (or other medication) are at risk of serious physical and emotional harm and may be required to spend additional time in custody because of easily preventable hospitalizations.  As Mr. Goodykoontz's story illustrates, thousands of other District of Columbia residents with disabilities are at risk of prolonged detention because of Defendant's failure to comply with its obligations under federal and District of Columbia law.

4.      Accordingly, Mr. Goodykoontz brings this action against Defendant to seek redress for Defendant's violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*; the D.C. Human Rights Act, D.C. Code § 2-1402.73; and the Constitution of the United States.  He seeks damages for the harm done to him, as well as injunctive and declaratory relief to ensure that an arrest for a minor violation of law will not endanger his life or that of anyone else who requires regular medication.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over Plaintiff's claims brought under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the U.S.

Constitution pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction

over Plaintiff's claim brought under the D.C. Human Rights Act pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District under 28 U.S.C. § 1391 because the events giving

rise to Plaintiff's claims occurred in this district. Additionally, at all times material and relevant,

Defendant resided in and transacted business in this District.

## PARTIES

7.      Plaintiff John Goodykoontz lives at 1314 5th Street, N.W., in Washington, D.C.

8.      Defendant District of Columbia is a municipal corporation and the local

government of Washington, D.C. It is the governmental entity that maintains the Metropolitan

Police Department ("MPD") and the Department of Corrections, the agency within the District of

Columbia that is responsible for the care and well-being of people incarcerated in the Central

Cellblock and other D.C. jail facilities. D.C. Code § 24-211.02(a-1)(1). The District receives

federal funding that goes to both departments.

## FACTUAL BACKGROUND

9.      John Goodykoontz is 31 years old and resides in Washington, D.C. As of April

2014, Mr. Goodykoontz was enrolled in a master's degree program in interior design and

architecture at the Corcoran College of the Arts & Design. He has Type 1 diabetes.

10.     Type 1 diabetes is recognized as a disability for purposes of the ADA, the

Rehabilitation Act, the D.C. Human Rights Act, and other laws. It is a medical condition

involving the pancreas failing to produce an adequate supply of insulin. Insulin is a hormone

that facilitates the process whereby glucose (blood sugar) enters body cells to produce energy.

When the body has insufficient insulin, it cannot generate energy from glucose in this manner

and must instead break down fat cells for energy.  Doing so results in the build-up of acids called ketones, which at high enough levels become toxic.

11.     Management of Type 1 diabetes thus requires regular monitoring of blood sugar levels and the activities that affect them, such as eating and exercise.  It also requires an infusion of insulin, generally by injection, when those levels become abnormal, which sometimes occurs several times a day.  Failure to take these steps in a timely way can result in serious physical harm.  Mr. Goodykoontz and most other diabetics inject themselves without any need for assistance by medical personnel.

12.     Mr. Goodykoontz has adhered to the regimented schedule required to maintain his health.  As a result, he has managed his diabetes without suffering serious harm.  That changed in April 2014 as a result of Defendant's conduct.

13.     On April 14, 2014, Mr. Goodykoontz took a taxi to his scheduled class at the Corcoran campus in the Glover Park neighborhood in the upper northwest quadrant of Washington, D.C.  He was initially unable to pay his fare with his debit card, and the taxi driver called the Metropolitan Police Department (the "MPD").  By the time police arrived, Mr. Goodykoontz had paid the taxi driver, who had no further complaint.

14.     Nonetheless, the MPD officers ran Mr. Goodykoontz's information through a background check.  They discovered that, unbeknownst to Mr. Goodykoontz, he had an open traffic case for unresolved speeding tickets in Maryland.

15.     The MPD officers arrested Mr. Goodykoontz and brought him to the Second District stationhouse at 3320 Idaho Avenue, N.W., where they locked him in a holding cell for the next two hours.

16.     During that time, Mr. Goodykoontz repeatedly informed various MPD officers that he had Type 1 diabetes and would require an injection of the insulin that he had with him. The District, however, specifically bars its police officers, security officers, and other employees from dispensing medication themselves or permitting arrestees and inmates from administering their own medication.  Instead, it requires all medication to be administered by health care professionals, including the routine injection of insulin.  However, there are no such health care professionals at police stationhouses.

17.     Rather, it is official District policy that an arrestee with diabetes must request that police officers bring him to a hospital in order to have a routine administration of insulin.  An arrestee who chooses to go to the hospital to get needed insulin—or even to have blood sugar levels tested—risks missing an arraignment that would normally be scheduled and spending a night in jail.

18.     Pursuant to this policy, the officers told Mr. Goodykoontz that he would not be permitted to inject himself or have any officer inject him. They also said they could give him no assurances as to when he would be transported from that location or have access to insulin. The only option they provided him for receiving insulin at a time certain was to be taken to a hospital via an ambulance.

19.     Knowing that he would soon experience severe symptoms without a timely administration of insulin, Mr. Goodykoontz eventually elected to have an ambulance called to transport him to Sibley Hospital, where he received an administration of insulin while handcuffed to a gurney and guarded by two MPD officers.  After the injection, Mr. Goodykoontz's glucose levels were tested and found to be normal at that time.

20.     A nurse informed Mr. Goodykoontz—and the police officer accompanying him—that he would need insulin before his arraignment the following morning.  The officer warned Mr. Goodykoontz that he should be careful before asking to go to the hospital again.  The officer told Mr. Goodykoontz that many arrestees found reasons to go to the hospital in order to spend a night there instead of jail, but by doing so an arrestee can end up missing a scheduled arraignment.

21.     At about 5:00 p.m., Mr. Goodykoontz was discharged from the hospital.  The MPD officers informed him that it was too late for him to be arraigned that day.

22.     Because the Second District stationhouse apparently does not hold arrestees overnight, the MPD officers then transported Mr. Goodykoontz to Central Cellblock, located at MPD headquarters, at 300 Indiana Avenue, N.W., where the District houses individuals who have not made their initial court appearances.  By District of Columbia law, the Department of Corrections is "responsible for the safekeeping, care, and protection of all persons detained at the Central Cellblock."  D.C. Code § 24-211.02(a-1)(1).

23.     There is no healthcare service provided to detainees at Central Cellblock as a matter of course.  Instead, an individual must request that an officer arrange a special "sick visit" to the health clinic in Central Cellblock to receive healthcare, including routine administration of medications, or an officer must take the initiative to trigger such a "sick visit."

24.     Mr. Goodykoontz told personnel at Central Cellblock that he had Type 1 diabetes and needed to maintain stable glucose levels through a combination of diet and insulin, or he was at risk of serious physical and emotional harm.  Nonetheless, Central Cellblock personnel made no attempt to accommodate his dietary needs.

25.     That evening, Mr. Goodykoontz briefly saw a health provider named Evelyn Omoregbee at the health clinic in Central Cellblock.  Ms. Omoregbee tested Mr. Goodykoontz's glucose level and administered insulin.  She instructed Mr. Goodykoontz to ask an officer to bring him back to the clinic before 6:00 a.m. the next morning for further care, but she did nothing to ensure that such care would be arranged or administered.  In her notations in Mr. Goodykoontz's file, Ms. Omoregbee made clear that she had put the onus on him to ensure that he would receive the care he needed:  "Instructed arrestee to follow up for finger stick blood sugar in the morning."

26.     Mr. Goodykoontz was too anxious to sleep the night of April 14 into the morning of April 15.  Instead, he spent the night asking the various correctional officers who passed by his cell what time it was and reminding them that he would need to be brought to the clinic for insulin by 6:00 a.m.  The officers assured him that he would receive appropriate treatment the next morning, but provided no specifics about when or how he would be transported to such care.

27.     Defendant did not provide the necessary medical care the next morning.  Rather, around 6:00 a.m. on April 15, the officers began preparing detainees to be taken to the courthouse for arraignment.  Mr. Goodykoontz again asked when he would get his insulin.  He was told he would have to receive it at the courthouse.

28.     Officers loaded Mr. Goodykoontz into a van along with other detainees and brought him to a waiting area in D.C. Superior Court.  Hours passed.  Mr. Goodykoontz sat in a room with other detainees, waiting to see an attorney and be arraigned.  He told various officers who passed by that he still was waiting to get insulin. All of the officers refused to help him.

One officer told him to stop complaining, saying that everyone in the D.C. prison system has diabetes.

29.     Just before noon, Mr. Goodykoontz began weakening rapidly, and he told the officers he was feeling sick.  It was not until Mr. Goodykoontz nearly passed out that someone contacted D.C. Emergency Medical Services ("EMS") to report an unconscious person in the holding cell.  By the time an EMS team arrived, Mr. Goodykoontz was conscious but dizzy.  The team tested Mr. Goodykoontz's blood sugar and found that his glucose levels had spiked dangerously high.  EMS personnel administered oxygen and fluid through an IV drip.

30.     Mr. Goodykoontz was told he would be taken to the hospital.  Understanding that another trip to the hospital would likely delay his arraignment and prolong his detention, Mr. Goodykoontz refused transport so that he could be promptly arraigned that day.  An officer told him that the decision was not his, and directed EMS to transport him to Washington Hospital Center.

31.     Medical staff at Washington Hospital Center confirmed that Mr. Goodykoontz had suffered an episode of diabetic ketoacidosis ("DKA"), which occurs when a combination of high blood sugar levels and insufficient insulin cause a build-up of toxic acids called ketones.  DKA can cause serious harm, including death.  Mr. Goodykoontz had never experienced DKA of this magnitude prior to being in Defendant's custody.

32.     Mr. Goodykoontz was admitted and then received insulin and fluids around 1:20 p.m.  Doctors informed him that he should remain at the hospital for close monitoring of blood sugar and fluid levels.

33.     The officer who accompanied Mr. Goodykoontz to Washington Hospital Center informed him that if he remained in the hospital he would not be arraigned that day and would have to spend an additional night in jail.

34.     The correctional officer's statement left Mr. Goodykoontz with two unacceptable choices.  If he stayed in the hospital as medically advised, his liberty would be infringed for another night until he could be arraigned on April 16.  If he checked himself out of the hospital on April 15 in order to attend an arraignment, he had no assurance of adequate medical care while he remained in Defendant's custody, and might be subjected to further injury.

35.     Because it appeared to be the only way to avoid returning to Central Cellblock, Mr. Goodykoontz signed out of the hospital against medical advice at 2:47 p.m. on April 15. The officer assured Mr. Goodykoontz's doctor (and Mr. Goodykoontz) that he would be arraigned quickly and could return immediately to the hospital for further observation.

36.     Mr. Goodykoontz was brought back to the courthouse, but his promised arraignment did not occur.  When he arrived, he was told arraignments were done for the day.

37.     As scheduled, Mr. Goodykoontz's case had previously been called by a judge that afternoon.  His lawyer was present and entered an appearance.  His aunt was present and ready to post bond, which court documents indicate had been set at $1,000.  If Mr. Goodykoontz had been present, he would have been immediately released.  However, because Defendant's conduct required him to be hospitalized instead of appearing, he was forced to spend a second night behind bars.

38.     Mr. Goodykoontz was put on a bus with prisoners who had been arraigned.  He was not returned to Central Cellblock, but instead was taken to the Central Detention Facility, which is known as the D.C. Jail, located at 1901 D Street, S.E.  D.C. Jail is a longer-term holding

9

facility that primarily houses inmates who have made their first court appearances but have not

been sentenced.  At D.C. Jail, unlike at Central Cellblock, inmates see a medical professional

upon entry as a matter of policy and do not need to ask for a "sick call."

39.     A nurse performed a standard assessment of Mr. Goodykoontz's health.  She

administered insulin that evening and made an appointment for Mr. Goodykoontz to receive his

next administration the following morning.  The nurse also prescribed a diet suitable for

someone with diabetes, including a snack.

40.     The next morning, April 16, Mr. Goodykoontz received an administration of

insulin at his scheduled appointment.  He was brought back to the courthouse and was arraigned

that afternoon.

41.     After his arraignment, Mr. Goodykoontz was brought back to D.C. Jail for final

processing before release.  Following hours of being unable to eat, receive insulin, or otherwise

control his blood sugar, Mr. Goodykoontz, again became weak.  He was brought directly back to

the D.C. Jail clinic.

42.     A doctor at D.C. Jail determined that Mr. Goodykoontz once again was

experiencing DKA.  After administering insulin and a fluid infusion, the doctor recommended

that Mr. Goodykoontz begin the DKA treatment protocol at the jail.

43.     Desperate to be released, Mr. Goodykoontz declined to follow that

recommendation.  He once again was required to sign a form saying he was doing so against

medical advice.  This form stated that Mr. Goodykoontz's condition—which had been caused by

the District's actions—put him at risk of vomiting, coma, and death.

44.     Mr. Goodykoontz was released later in the evening of April 16.  He travelled

immediately to Washington Hospital Center's emergency room.

45.     Mr. Goodykoontz's blood glucose levels were dangerously high and he remained in DKA.  He spent the next two days recuperating in the critical care unit at Washington Hospital Center.

46.     On April 18, 2014, at 2:20 p.m., Washington Hospital Center discharged Mr. Goodykoontz.

47.     More than four days after Defendant took him into custody because of his unresolved traffic matters—and three hospital visits later, all of which could have been avoided with appropriate medical care—Mr. Goodykoontz returned home.

48.     As a reminder of his ordeal, Mr. Goodykoontz received a bill for his ambulance ride to Sibley Hospital.  He also was sent a bill for his visit to Sibley Hospital for the purpose of having medical professionals perform the same injection he could have performed himself.

**Injuries to Plaintiff**

49.     As a result of Defendant's failure either to adequately accommodate his disability or provide him with proper medical attention, Mr. Goodykoontz suffered, and continues to suffer, significant physical and emotional distress.

50.     Had Defendant promptly processed Mr. Goodykoontz, or permitted him to administer his own insulin, he could have been arraigned and released the same day he was arrested.  Instead, as a result of Defendant's policies, Mr. Goodykoontz was unnecessarily forced to spend three days and two nights in custody, and an additional two days in a hospital critical care unit recovering from his detention.

51.     While this wrongful deprivation of liberty would cause mental and emotional distress to anyone, Mr. Goodykoontz also suffered the stress and uncertainty of not knowing

when or whether he would receive the insulin he needed.  Additionally, Mr. Goodykoontz was forced repeatedly to make stressful decisions regarding whether he should further endanger his health to avoid spending additional time in Defendant's custody.

52.     Mr. Goodykoontz also suffered economic injury as a result of Defendant's conduct.  That injury includes, but is not limited to, medical bills that Mr. Goodykoontz was required to pay.

53.     At all relevant times, Defendant was aware that Mr. Goodykoontz had diabetes and that he needed insulin regularly.  Nonetheless, it persisted in enforcing its wrongful policy and in denying Mr. Goodykoontz the insulin he needed.  It also acted with deliberate indifference to a substantial risk to Mr. Goodykoontz's health and liberty.

54.     Because Defendant has not remedied the policy deficiencies that caused his injuries, Mr. Goodykoontz must live with the fear that his life will again be endangered should he be arrested for any reason.  This concern is magnified by the District's policy of permitting its police officers to make arrests for minor, non-criminal offenses, as outlined below.

55.     For example, the District regularly arrests—and sometimes jails—drivers who have expired license plates.  *See* Ashley Halsey III, *Expired License Plates in DC Could Land You in Jail*, Wash. Post, Oct. 11, 2011, *available at* https://www.washingtonpost.com/local/expired-license-plates-in-dc-could-land-you-in-jail/2011/10/11/gIQAJjdhdL_story.html.

56.     The District has explicitly authorized its officers to, at their discretion, arrest people for numerous other minor offenses, such as failing to collect dog excrement and fishing without a license.  *See* Mike DeBonis, *Here Are 159 Minor Things D.C. Officers Can Arrest You For*, Wash. Post, Oct. 24, 2011, *available at* https://www.washingtonpost.com/blogs/mike-

debonis/post/here-are-159-minor-things-dc-officers-can-arrest-you-

for/2011/10/24/gIQA4mDRDM_blog.html.

57.     Thus, until the District changes its policies with respect to arrestees with diabetes,

Mr. Goodykoontz and anyone residing in the District with Type 1 diabetes (or similar conditions

requiring regular administration of medication) is at substantial risk of having these policies

endanger his or her life even if he or she commits no crime that warrants incarceration.

**The District's Policies For Handling Arrestees With Diabetes Are Inadequate**

58.     Mr. Goodykoontz's injuries are the direct result of Defendant's policies, which

prevented Mr. Goodykoontz and others with similar needs from receiving routine but vital

medical care (including administrations of insulin or other medication) in a manner that

minimizes their time in detention.  These policies are unreasonable and unlawful.

59.     There is no valid reason for the District's policy that bars its police officers,

security officers, and other employees from dispensing medication themselves or permitting

arrestees and inmates from administering their own medication.  In fact, the District's policy

directly conflicts with that of the federal government.  The Federal Bureau of Prisons states that

"[d]irectly observed self-administration of insulin is recommended whenever feasible." *See*

Federal Bureau of Prisons, *Clinical Practice Guidelines: Management of Diabetes* 14 (June

2012), *available at* http://www.bop.gov/resources/pdfs/diabetes.pdf. The District could readily

train its employees to observe and supervise the self-administration of insulin, but it chooses not

to.

60.     What makes this policy especially problematic is that the District does not ensure that those it takes into custody have regular access to health care professionals prior to arraignment.

61.     No health care professionals were available at the stationhouse where the District initially confined Mr. Goodykoontz for an extended period of time.  Instead, as police officers told Mr. Goodykoontz, it is official District policy that an arrestee with diabetes must request that police officers bring him to a hospital in order to have a routine administration of insulin. An arrestee who chooses to go to the hospital to get needed insulin—or even to have blood sugar levels tested—risks missing arraignment, spending additional time in jail, and incurring hospital bills.

62.     The District provides minimal healthcare services at Central Cellblock.  Until December 2013, Central Cellblock had no medical facility at all.  It now employs a single nurse and a single physician's assistant for the purpose of dispensing medication and performing minor procedures.  In a budget request to the D.C. Council, the Department of Corrections stated that these health care providers are available 12 hours per day.  *See* D.C. Department of Corrections, *Response to Performance Questions* (2015), *available at* http://dccouncil.us/files/user_uploads/budget_responses/correctionsperformanceresponses2015.pdf.

63.     While an individual in custody can attempt to arrange a "sick visit," the District has no process beyond trusting the discretionary judgment of its officers to ensure that necessary "sick visits" are, in fact, arranged.  In particular, there is no process whereby the judgment of the District's own medical provider is conveyed directly to Central Cellblock officers.  Instead, Mr.

14

Goodykoontz was told that it was up to him to convince the officers that a sick visit was necessary.

64.     The District is well aware that, as a result of its failure to provide adequate medical care to arrestees on-site, those arrestees are frequently taken to the hospital for visits that would have otherwise been unnecessary.  Its response to that problem has been, as occurred here, to encourage correction officers and police officers to ignore arrestees' medical needs in order to avoid those hospital visits.

65.     The District devotes considerable manpower to guarding arrestees in hospitals. Police Chief Cathy Lanier said publicly in 2013 that, on some weekends, as many as 40 police officers at a time were forced out of patrol service to guard prisoners in hospitals.  *See* Scott McFarlane, *Jail Health Clinic Should Keep D.C. Police Officers Off 'Hospital Detail' and on the Street*, NBC News, available at http://www.nbcwashington.com/investigations/Jail-Health-Clinic-Should-Keep-DC-Police-Officers-Off-Hospital-Duty-and-on-the-Street-240956801.html. At her urging, responsibility for guarding Central Cellblock was shifted from the MPD to the Department of Corrections, so that the MPD would not have to continue wasting resources in this manner or exposing itself to liability for the failure to protect prisoners' health.

66.     Police Chief Lanier acknowledged that District employees had come to believe that many inmate health complaints were false and were made solely to trigger the officer's duty to bring the inmate to the hospital.  As she told news organizations, the prevailing view was that "[i]t's probably more comfortable in a hospital bed than in a cell block."  *See id.*

67.     The District thus officially sanctioned a cynical attitude regarding prisoner pleas for medical attention in Central Cellblock.  This explains why Mr. Goodykoontz's pleas for help

were ignored, and makes particularly problematic the official policy that required him to convince an officer he needed help.

68.     The Department of Corrections boasts that, since Police Chief Lanier's comments, it has reduced the number of hospital trips from Central Cellblock by 90 percent, saving more than $1.5 million per year.  It attributes this drop to Central Cellblock's new on-site medical clinic.  The District thus is well aware that providing needed medication on-site will prevent the need for more costly hospitalization later, yet it took no action to ensure that Mr. Goodykoontz would get the medication that its own clinic had prescribed.

69.     The District should have known, and did know, that it needed to take further steps to ensure the health of arrestees with diabetes and other conditions that require regular medication.

70.     A large number of people with diabetes are arrested by the District and cycle through the District's detention system each year.  The District takes into custody about 12,000 to 17,000 people each year.  On any given day, the D.C. Department of Corrections has about 2,000 prisoners in its custody.  It reports that, on June 10, 2015, it knew of 57 individuals with diabetes in its custody.  This figure may well understate the prevalence of diabetes in D.C. facilities.  A U.S. Department of Justice report found that 9 percent of state and local prisoners have diabetes, a somewhat higher rate than the 6.5 percent of the general population that has diabetes.  *See* Laura Maruschak, Marcus Berzofsky & Jennifer Unangst, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12* 3 (2015), *available at* http://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.  While the majority of these people have Type 2 diabetes, which is somewhat different medically, their needs are similar enough that it is

unreasonable for the District not to have policies in place to ensure the health of this very large group of people at all stages of their confinement.

71.     The District has received complaints similar to Mr. Goodykoontz's and has been made aware that it needs a better process for ensuring that arrestees with diabetes receive insulin.

72.     For example, the D.C. Police Complaints Board issued a report in August 2007 entitled "Medical Treatment of Arrestees."  Among the incidents highlighted in this report was one in which a woman was arrested, brought to a holding cell in a police station, and then denied insulin for eight hours because the attending officer thought she was faking her symptoms. Among this report's suggestions was to have trained health care providers either present at the police station or on call.  Moreover, numerous other jurisdictions have been sued for comparable failure to ensure that arrestees with diabetes receive timely insulin prior to arraignment.

73.     The District thus was aware that a substantial number of inmates in its custody have diabetes and was aware of those inmates' needs.  Yet it persisted in applying to Mr. Goodykoontz the unlawful policies described in this Complaint, policies it knew or should have known created a substantial risk that arrestees with diabetes will not get the insulin they need in a timely fashion.

74.     At all times relevant hereto, in acting or omitting to act as pled above, each individual employee of Defendant was the actual or apparent agent, employee, manager, or representative of Defendant, and was acting in the course and scope of his, her, or its actual or apparent authority pursuant to such agencies; and the alleged acts or omissions of each individual as agent were subsequently ratified and adopted by Defendant as principal.  Throughout this Complaint, actions attributed to Defendant include those acts by its agents on its behalf.

## CAUSES OF ACTION

**FIRST CLAIM FOR RELIEF—Violation of Title II of the Americans with Disabilities Act**
(42 U.S.C. § 12131 *et seq.*)

75.     Plaintiff John Goodykoontz realleges and incorporates by reference paragraphs 1-74, as if fully set forth herein.

76.     The District is a public entity subject to the non-discrimination requirements of Title II of the Americans with Disabilities Act.

77.     Defendant's acts, policies, and practices discriminate against individuals with disabilities who require insulin or other regular medication.  Because of Plaintiff's disability, he was deprived of an equal opportunity to be arraigned and released in a timely fashion and suffered a deprivation of his liberty.  Because of his disability, Defendant also subjected him to conditions that endangered his health and otherwise harmed him.

78.     Defendant's policy of requiring people with diabetes to be hospitalized for routine injection of insulin or other medication prevents individuals with disabilities from receiving a public entity's services in the most integrated possible setting in violation of regulations implementing Title II's anti-discrimination mandate.  *See* 28 C.F.R. § 35.130(d).

79.     Defendant has failed to make reasonable modifications to its policies to ensure that Plaintiff and others with disabilities do not face such discrimination because of their disabilities.

**SECOND CLAIM FOR RELIEF—Violation of Section 504 of the Rehabilitation Act**
(29 U.S.C. § 794 *et seq.*)

80.     Plaintiff John Goodykoontz realleges and incorporates by reference paragraphs 1-74, as if fully set forth herein.

81.     The District receives federal funding, as do both the MPD and the D.C. Department of Corrections.  The activities of all three entities thus are subject to the anti-discrimination requirements of Section 504 of the Rehabilitation Act.

82.     Defendant's acts, policies, and practices discriminate against individuals with disabilities who require insulin or other regular medication.  Because of his disability, Plaintiff was deprived of an equal opportunity to be arraigned and released in a timely fashion and suffered a deprivation of his liberty.  Because of his disability, Defendant also subjected him to conditions that endangered his health and otherwise harmed him.

83.     Defendant has failed to make reasonable modifications to its policies and practices to ensure that Plaintiff and others with disabilities do not face such discrimination because of their disabilities.

### THIRD CLAIM FOR RELIEF—Violation of D.C. Human Rights Act
(D.C. Code § 2-1402.73)

84.     Plaintiff John Goodykoontz realleges and incorporates by reference paragraphs 1-74, as if fully set forth herein.

85.     The D.C. Human Rights Act makes it unlawful for a District of Columbia government agency or office to discriminate in the facilities, services, programs, or benefits it provides because of an individual's disability.

86.     Defendant's acts, policies, and practices discriminate against individuals with disabilities who require insulin or other regular medication.  Because of his disability, Plaintiff was deprived of an equal opportunity to be arraigned and released in a timely fashion and suffered a deprivation of his liberty.  Because of his disability, Defendant also subjected him to conditions that endangered his health and otherwise harmed him.

87.     Defendant has failed to make reasonable modifications to its policies and practices to ensure that Plaintiff and others with disabilities do not face such discrimination because of their disabilities.

### FOURTH CLAIM FOR RELIEF—Violation of the U.S. Constitution
(42 U.S.C. § 1983)

88.     Plaintiff John Goodykoontz realleges and incorporates by reference paragraphs 1-74, as if fully set forth herein.

89.     The District and its agencies are subject to suit under 42 U.S.C. § 1983 where its policies violate constitutional rights.

90.     The Constitution requires that arrestees who have not been arraigned, let alone convicted, must be provided medical care to at least the extent that is required for those who have been convicted of a crime.

91.     Defendant failed to provide Plaintiff with constitutionally adequate medical care. It knew that Plaintiff had diabetes and required insulin at regular times.  Defendant's own health care professionals prescribed this insulin and recognized the need for it.  Yet Defendant refused to provide it.

92.     This refusal was a result of Defendant's failure to properly train its agents to take seriously the urgent medical needs of those in its custody.  Instead, Defendant's top leadership adopted an official attitude of cynicism and disbelief of inmates' pleas for medical assistance.

93.     Defendant was deliberately indifferent to Plaintiff's known medical needs.  As a result, Plaintiff suffered serious injury as described in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Goodykoontz prays that this Court grant the following

relief:

a.      grant Plaintiff's request for declaratory relief, finding that Defendant's

actions violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12131 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*; the D.C.

Human Rights Act, D.C. Code § 2-1402.73; and the Constitution of the United States;

b.      enjoin Defendant from engaging in the discriminatory conduct described

herein and direct it to take all affirmative steps necessary to prevent additional instances

of such conduct or similar conduct from occurring in the future;

c.      enter a judgment for compensatory damages in favor of Plaintiff in an

amount to be proven at trial before a jury that would fully compensate Plaintiff for the

injuries alleged herein resulting from Defendant's conduct;

d.      award Plaintiff his reasonable attorneys' fees and costs pursuant to 42

U.S.C. § 1988; and

e.      grant such other relief as it deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 8, 2016

Respectfully submitted,

/s/ Sasha Samberg-Champion
Megan Cacace (D.C. Bar No. 981553)
Sasha Samberg-Champion (D.C. Bar No. 1026113)
Jia M. Cobb (D.C. Bar No. 503340)

21

RELMAN, DANE & COLFAX, PLLC
1225 19th St., N.W., Suite 600
Washington, D.C. 20036-2456
Tel: (202) 728-1888
Fax: (202) 728-0848
Email: rcolfax@relmanlaw.com
      ssamberg-champion@relmanlaw.com
      jcobb@relmanlaw.com


/s/ Deborah M. Golden
Deborah M. Golden (D.C. Bar No. 470578)
Elliot Mincberg (D.C. Bar No. 941575)
Ann Weber (D.C. Bar No. 1014563)
D.C. Prisoners' Rights Project
Washington Lawyers' Committee on
Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 319-1000
Fax: (202) 319-1010
Email: Deborah_Golden@washlaw.org
      Elliot_Mincberg@washlaw.org
      Ann_Weber@washlaw.org


*Counsel for Plaintiff*